Filed 10/10/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| TARGET CORPORATION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>GOLDEN STATE INSURANCE COMPANY LIMITED et al.,<br><br>    Defendants and Respondents. | 2d Civil No. B279995<br>(Super. Ct. No. NC059999)<br>(Los Angeles County) |

This appeal involves complex issues in the interpretation of indemnification/defense clauses and additional insured endorsements. Target Corporation (retailer) appeals from the judgment entered in favor of respondents Golden State Insurance Company Limited (carrier) and its insured, McKesson Corporation (supplier), which had distributed a pharmaceutical product to retailer. Supplier's contract with retailer included a clause requiring supplier to indemnify and defend retailer. Retailer was named as an additional insured on the policy that carrier had issued to supplier.

A customer purchased from retailer the pharmaceutical product distributed by supplier. She had an adverse reaction to

the product that resulted in serious bodily injury. Customer sued retailer, but supplier and carrier refused to defend it. Retailer brought the present action against supplier and carrier seeking to compel them to defend it. The trial court granted supplier's and carrier's motion for summary adjudication because customer's lawsuit was based not on a defective product distributed by supplier, but on retailer's alleged mislabeling of the product and failure to warn of possible adverse reactions to the product.

We conclude that the indemnification/defense clause in supplier's contract with retailer and the additional insured endorsement do not require supplier and carrier to defend retailer against customer's lawsuit. Accordingly, we affirm.

*Factual and Procedural Background*

Supplier distributes prescription drugs, in bulk, to retailers. It does not manufacture drugs. Supplier and retailer entered into a Pharmaceutical Supply Agreement (the Agreement). The Agreement contained a broad indemnification clause requiring supplier to "indemnify, hold harmless, and defend [retailer] . . . against any and all actions [or] claims . . . relating to or arising out of . . . Products purchased by [retailer] from [supplier], . . . provided however, that the foregoing indemnity shall not apply to any claims . . . arising out of or due to the negligence or willful misconduct or omission of [retailer] . . . ." The Agreement said that "[supplier] shall obtain and maintain . . . commercial general liability insurance . . . , including products liability/completed operations . . . [and] coverage for contractual indemnification obligations." The policy will "provide that [retailer] is included as an additional insured."

2

The Agreement stated that it "shall be governed by and construed in accordance with the laws of the State of Minnesota."

Carrier issued a commercial general liability insurance policy designating supplier as the named insured and retailer as an additional insured. The additional insured endorsement provided that coverage applies "only with respect to 'bodily injury' or 'property damage' arising out of 'your products' [supplier's products] . . . which are distributed or sold in the regular course of the vendor's business [retailer's business]." There is a key exception to the general coverage provision: Additional insured coverage does not apply to "[r]epackaging" of products or "[p]roducts which, after distribution or sale by you [supplier] have been labeled or relabeled." The endorsement defined "[y]our products" as "[a]ny products of the named insured [supplier]." (Bold omitted; see *infra* pp. 8-9.)

In August 2012 customer "filed products liability and professional negligence claims against [retailer and supplier] after developing a rare skin reaction . . . that she believes was caused by her ingestion of a prescription drug product . . . (a generic form of Septra DS [also known as Bactrim DS]) (hereinafter, the 'Product') she purchased at [retailer's] pharmacy" in Northridge, California. Supplier had distributed the Product to retailer. Retailer "tendered the defense of the Underlying Action to [supplier]," which "accepted [retailer's] tender."

Customer's second amended complaint (customer's complaint) consisted of six causes of action against retailer and supplier. The complaint alleged, "The bottle containing the Product supplied to [customer] instructed her to 'Finish All Of This Medicine Unless Otherwise Directed By Your Doctor.'"

3

Customer contended that the label was "misleading and defective" because it did not contain "the FDA-approved" warning that the Product "should be discontinued at the first appearance of skin rash or any sign of adverse reaction." (Bold and capitalization omitted.) Retailer and supplier allegedly "gave [customer] written instructions and literature regarding the description and use of the Product . . . which [she] relied upon, [and] which was inaccurate."

According to customer's complaint, in October 2011 her "skin began to peel off all over her body. As a result, she was transferred to the burn unit at the University of Utah's hospital where she remained in critical care for approximately 7 1/2 weeks after being diagnosed with Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis . . . ." Retailer and supplier "failed . . . to provide adequate warnings to [customer] regarding the potential serious danger and proper use of the Product."

At customer's request, in January 2014 her action against supplier, but not against retailer, was dismissed without prejudice pursuant to an agreement between customer and supplier. In June 2015 the action against supplier was dismissed with prejudice.

In October 2014 retailer filed a motion for summary judgment. In opposition to the motion, customer stated: "Here, the evidence is that [retailer] did not use due care in labeling the medication." [Customer] is not attempting to hold [retailer] liable on the basis that [it] dispensed a defectively designed drug." "[Retailer] failed to properly warn [her] regarding the prescription for [the Product it] filled. [Retailer's] failures were ones of both omission and commission. [It] not only omitted to provide warnings of side effects and adverse reactions that

4

should have been given, the instructions and warnings [it] did give were wrong.  Following the instructions and not being properly warned, [customer] suffered the serious adverse reaction of having much of her skin burn off of her body."

In its January 2015 ruling denying retailer's motion for summary judgment, the trial court said, "[Customer's] basis for her claims is . . . failure to warn."  The court concluded:  "The breach of warranty and strict liability claims survive because [retailer] designed and provided the labeling for the drug it dispensed, changing the FDA-approved labeling.  The retailer thus was not providing the drug as it was given by the manufacturer.  [Customer] claims that this constitutes a mislabeling, which is providing a product."  "The negligence causes of action survive because of the allegations that [retailer] negligently represented that the warnings and directions were adequate and 'negligently failed to disclose . . . important safety and injury information' about the drug."

In February 2015 carrier and supplier terminated their defense of retailer.  In April 2015 retailer brought the present action for "the wrongful denial of a defense under contractual indemnity clauses by . . . [supplier] and under an insurance policy issued by . . . [carrier]."  The complaint consists of three causes of action.  The first cause of action is for declaratory relief.  It seeks a declaration that supplier and carrier must defend retailer and "pay for those amounts which [retailer] incurs to satisfy any settlement of or judgment in [customer's] action."  The second cause of action alleges that carrier and supplier breached their contractual obligations and an implied covenant of good faith and fair dealing "by terminating their defense of [retailer]."  The third cause of action seeks indemnity and contribution against supplier

5

for (1) fees and costs incurred by retailer in defending against customer's action, and (2) any sums paid by retailer to customer.

In November 2015 carrier and supplier filed a motion for summary adjudication as to the first and second causes of action. They argued that supplier has no duty to defend retailer because customer's "claims against [retailer] arise directly out of its own alleged mistakes in labeling the medication." Carrier also has no duty to defend retailer because customer's "claims actually identify [retailer's] label as the relevant product, and the additional insured coverage only applies to claims arising out of supplier's products."

In January 2016 customer "resolved her claims against [retailer]." In March 2016 the trial court granted carrier's and supplier's motion for summary adjudication as to the first and second causes of action of retailer's lawsuit. In September 2016 retailer voluntarily dismissed without prejudice its third cause of action for indemnity and contribution against supplier. Judgment was subsequently entered in carrier's and supplier's favor.

*Standard of Review*

"A motion for summary adjudication shall be granted . . . if it completely disposes of a cause of action . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).) "Summary adjudication motions are 'procedurally identical' to summary judgment motions. [Citation.]" (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859.)

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v.*

6

*Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

"[W]e independently review the record that was before the trial court when it ruled on [carrier's and supplier's] motion. [Citations.] In so doing, we view the evidence in the light most favorable to [retailer] as the losing part[y], resolving evidentiary doubts and ambiguities in [its] favor. [Citation.]" (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.) "We must presume the judgment is correct . . . ." (*Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1376.) "'As with an appeal from any judgment, it is the appellant's [retailer's] responsibility to affirmatively demonstrate error . . . .'" (*Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 230.)

*The Trial Court Did Not Err in Granting*
*Carrier's Motion for Summary Adjudication*

The issue here is one of pure law because it involves the interpretation of carrier's additional insured endorsement. "'When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.]' [Citation.] [¶] 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] . . .' [Citations.]" (*Powerine Oil Co. v. Superior Court* (2005) 37 Cal.4th 377, 390.)

7

The additional insured coverage applies "only with respect to 'bodily injury' or 'property damage' arising out of 'your products,'" i.e., supplier's products. "California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only *a minimal causal connection or incidental relationship*." (*Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 328, italics added.)

There is no "minimal causal connection or incidental relationship" between the Product distributed by supplier and customer's injury. (*Acceptance Ins. Co. v. Syufy Enterprises*, *supra*, 69 Cal.App.4th at p. 328.) Customer claimed that her injury arose not from a defective product, but from retailer's failure to warn of the risks and possible side effects of the Product. Supplier did not distribute or have any role in preparing the information about the Product that retailer provided to customer. Retailer acknowledges: "Suppliers of medications to retail pharmacies never supply those medications in a form suitable for simply handing over the drug to the retail customer. Those medications always are transferred [by the retailer] from bulk containers to individual ones, with labels individually prepared [by the retailer] for each customer."

Moreover, the additional insured endorsement does not apply to "[r]epackaging" of products or "[p]roducts which, after distribution or sale by [supplier] have been labeled or relabeled." Retailer repackaged the Product and labeled it before customer purchased it. Retailer notes that in the trial court "[carrier]

8

contended that [retailer's] action of taking the medication from the bulk container in which it was sold by [supplier] and placing it in an individual container for [customer], with a label on that container provided by [retailer] itself, came within the exclusions of [the additional insured] [e]ndorsement . . . for repackaging and labeling and relabeling."  We agree with carrier because customer's claim was based on retailer's mislabeling of a product that was not defective.  (See *SDR Co., Inc. v. Federal Ins. Co.* (1987) 196 Cal.App.3d 1433).

*The Trial Court Did Not Err in Granting*
*Supplier's Motion for Summary Adjudication*

Retailer argues:  "If [carrier's] interpretation of [the additional insured endorsement] is accurate, then [supplier] breached its contractual obligation to obtain insurance coverage that actually provided [retailer] with the insurance protection it had bargained for."  Therefore, the trial court erroneously granted supplier's motion for summary adjudication as to the second cause of action for breach of contract.

We disagree.  The second cause of action did not allege that supplier had breached its contractual obligation to obtain additional insured coverage for retailer.  It alleged that supplier had "breached [its] obligation[] to [retailer] under the . . . Agreement[] . . . by terminating [its] defense of [retailer]."

In any event, there is no evidence that supplier failed to obtain the required insurance.  The Agreement did not impose on supplier a duty to provide additional insured coverage that would protect retailer from customer's claim that it had mislabeled the medication and had failed to warn of possible adverse reactions and side effects.

9

Supplier agreed to "indemnify, hold harmless, and defend [retailer] . . . against any and all actions [or] claims . . . relating to or arising out of . . . Products purchased by [retailer] from [supplier], . . . provided however, that the foregoing indemnity shall not apply to any claims . . . arising out of or due to the negligence or willful misconduct or omission of [retailer] . . . ."

Supplier's obligation to defend retailer is broader than carrier's obligation.  Supplier has a duty to defend as to claims "*relating to or* arising out of" its products, while carrier has a duty to defend only as to claims "arising out of" [not relating to] supplier's products.  (Italics added.)  (See *Rice v. Downs* (2016) 248 Cal.App.4th 175, 186, concerning the interpretation of arbitration clauses ["clauses requiring arbitration of a claim . . . 'arising out of' an agreement, i.e., excluding language such as 'relating to this agreement' . . . , are 'generally considered to be more limited in scope than would be . . . a clause agreeing to arbitrate "'any controversy . . . arising out of *or relating to* this agreement"'"].)

Carrier and supplier argue that the indemnification clause "unambiguously bars [retailer's] claim for indemnity [against supplier] where, as here, [customer's] claim [against retailer] was based solely on [retailer's] own negligence."  Retailer replies: "[Supplier's] reading of the indemnification provision of the Agreement[] would deprive [retailer] of a defense and of indemnification merely because of the allegation of negligence, regardless whether there was any merit to that allegation."  "The only reasonable reading of the exception to [supplier's] duty to defend and indemnify is that it applies to situations where *in fact* [retailer] was negligent and where the 'claims . . .' *in fact* arose out of or were due to that negligence on the part of

10

[retailer.] [¶] Thus, in order for [supplier] to obtain summary adjudication of the issue of whether it continued to owe [retailer] a duty to defend and indemnify, it was not enough for it merely to show that the pending allegations in the lawsuit at issue involved an **allegation** of [retailer's] negligence and a claim that [customer's] injuries arose from that negligence. [Supplier] had to establish as undisputed that [retailer] was **in fact** negligent, and that [customer's] claimed injuries **in fact** arose from that negligence. But [supplier] did not even attempt to make such a showing." "Since [supplier] did not show that fact to be undisputed as part of its motion for summary adjudication, that motion should not have been granted."

We look to Minnesota law because the Agreement specifies that it shall be construed in accordance with Minnesota law. "'[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties.'" (*Staffing Specifix, Inc. v. TempWorks Management Services, Inc.* (Minn. 2018) 913 N.W.2d 687, 692.) "[T]he court must give all terms their plain, ordinary and popular meaning so as to effect the intent of the parties. [Citation.] The parties' intent should be determined, 'not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which words and phrases are given a meaning in accordance with the obvious purpose of the . . . contract as a whole.'" (*Davis by Davis v. Outboard Marine Corp.* (Minn.Ct.App. 1987) 415 N.W.2d 719, 723.)

Retailer is claiming that supplier must defend it unless supplier establishes that customer's claim of negligence is in fact meritorious. This is contrary to Minnesota law concerning an insurer's obligation to defend. We recognize that supplier is an

11

indemnitor, not an insurer, but insurance law is pertinent. "An insurer's obligation to defend its named insured does not depend on the merits of the claim asserted but on whether the allegations of the *complaint* against the insured state a cause of action within the coverage afforded by the *policy*." (*Meadowbrook, Inc. v. Tower Ins. Co.* (Minn. 1997) 559 N.W.2d 411, 419; see also *Wooddale Builders, Inc. v. Maryland Casualty Co.* (Minn. 2006) 722 N.W.2d 283, 302 ["the duty to defend exists regardless of the merits of the underlying claims"].) "In addition to looking at the complaint, the insurer can look to facts outside the complaint to determine whether coverage exists." (*Haarstad v. Graff* (Minn. 1994) 517 N.W.2d 582, 584.)

Thus, in determining whether an insurer has a duty to defend, Minnesota courts consider the nature of the claim against the insured and whether that claim is covered by the policy, not whether the claim is meritorious. If the claim is within the policy's coverage, the duty to defend is triggered. It is not triggered if the claim falls outside the policy's coverage.

There is no reason why the rule should be different where the duty to defend arises not under an insurance policy, but under an indemnification clause in an agreement between a pharmaceutical distributor and a vendor that purchases drugs from the distributor. The distributor is not required to defend the vendor until, as retailer maintains, it "'establish[es] as undisputed that [the vendor] was in fact negligent, and that [the plaintiff's] claimed injuries . . . arose from that negligence.'" It is doubtful that the distributor would be able to establish this until the issue was resolved by the trial court or a jury. Moreover, it is the plaintiff's obligation, not the distributor's, to prove negligence. The practical effect of retailer's theory is that the

12

distributor would have to defend the vendor until a final judgment was entered in the negligence action. This would render meaningless the exception to the Agreement's duty to defend. "The law requires us to construe a contract as a whole so as to harmonize all provisions, if possible, and to avoid a construction that would render one or more provisions meaningless." (*Stiglich Const., Inc. v. Larson* (Minn.Ct.App. 2001) 621 N.W.2d 801, 803.)

*Disposition*

The judgment is affirmed. Carrier and supplier shall recover their costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


YEGAN, J.

We concur:

GILBERT, P. J.


TANGEMAN, J.

13

Ross M. Klein, Judge

Superior Court County of Los Angeles

_____

Manning & Kass, Ellrod, Ramirez, Trester, John M. Hochhausler and Steven J. Renick; Resnick & Louis and Martin D. Holly for Plaintiff and Appellant.

Farella Braun Martel, Erica Villanueva and Shanti Eagle for Defendants and Respondents.